# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : CASE NO.: 1:21-MJ-00653 |
| v. | : |
| | : |
| | : |
| IAN MICHAEL FRIED, | : |
| | : |
| Defendant. | : |

## MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER

Pursuant to 18 U.S.C. 3145(b), Defendant Ian Michael Fried ("Mr. Fried") hereby respectfully moves this Court to revoke or amend the Order of Detention Pending Trial issued by a magistrate judge in the District of Arizona on November 29, 2021. In the alternative, Mr. Fried respectfully requests that the Court grant a temporarily release until the COVID-19 pandemic has subsided.

### I. Procedural History

On November 12, 2021, Mr. Fried was charged by complaint in the District of Columbia with one count of possession of child pornography, under 18 U.S.C. § 2252(a)(2); and one count of receipt of child pornography, under 18 U.S.C. § 2252(a)(4)(B). A warrant issued on the same day, and Mr. Fried was arrested in Scottsdale, Arizona on or about November 23, 2021.

Mr. Fried made his initial appearance in the District of Arizona the following day, and the Government made a request pursuant to 18 U.S.C.

§ 3142(f)(1) for a detention hearing (*See*, Exhibit 1). On November 29, 2021, that hearing was held, and the presiding magistrate issued an order for Mr. Fried's pretrial detention. (*See*, Exhibit 2). Mr. Fried's initial appearance in the District of Columbia was held on December 28, 2021.

The magistrate in Arizona reasoned that "*Defendant's history and characteristics slightly favor release (lack of criminal history, family support, lack of flight after arrest despite the opportunity flee) over detention (past thoughts of suicide, current lack of employment.*" (Exhibit 2, p. 2). The magistrate, however, found that the nature and circumstances of the offense strongly favors detention: "*Defendant allegedly possessed more than 200 images and videos of sexual abuse of children. He allegedly possessed some of these items since 2003, and has been actively downloading and viewing child images since that time.*" The magistrate continued: "*Defendant's online discussions detail his encouragement of others engagement in this activity and Defendant made statements about what he would like to do to a child.*" (Exhibit 2, p. 2). The court concluded that no condition will reasonably assure the safety of others and the community (Exhibit 2, p. 1).

 II.  **Legal Standard**

Pursuant to 18 U.S.C. § 3145(b), a person who has been detained by a magistrate judge may file a motion for the revocation of or amendment to the detention order. Such a motion should be filed before "the court having original

jurisdiction over the offense." *Id.* As was recently noted by the Court in *United States v. McAbee*, though the District of Columbia Circuit "has not squarely decided the issue of what standard of review a district court should apply to review of a magistrate's detention or release order," this Court "ha[s] routinely held that such detention decisions are reviewed *de novo*." 2021 WL 6049909, at *6 (D.D.C. Dec. 21, 2021) (citations omitted).[1]

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The statutory scheme governing pretrial release and detention reflects this fact. Under the Bail Reform Act of 1984 ("the BRA"), 18 U.S.C. §§ 3141–3156, courts "shall order … pretrial release" on "personal recognizance, or upon execution of an unsecured appearance bond" for any defendant, "unless [the court finds] that such release will not reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3142(b). In essence, this means that only a defendant who is a "flight risk" or a "danger to the community" should not be released unconditionally upon his own recognizance. *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).

---

[1] *See also United States v. Hunt*, 240 F.Supp.3d 128, 132–33 (D.D.C. 2017) (noting that the Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have also found *de novo* review appropriate in these circumstances) (collecting cases).

3

Furthermore, even in the case of defendants who *are* adjudged to be dangerous or at risk of flight, the BRA nevertheless requires that courts "shall order" their pretrial release—so long as their release also be "subject to the least restrictive further condition, or combination of conditions" that are determined to reasonably assuage these concerns. 18 U.S.C. § 3142(c).

Actual pretrial detention is authorized only in the limited situation where a court finds that no such "condition or combination of conditions" can "reasonably assure" safety or a lack of flight. *Id*. at § 3142(e)(1). Additionally relevant here, where it is dangerousness that would justify the detention, the Government must prove by "clear and convincing evidence," *Id.* at § 3142(f)(2), that the defendant "poses a concrete prospective threat to public safety," which release conditions will not alleviate. *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

By contrast, pretrial incarceration is never permitted to be merely punitive, as a person "may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Detention under the BRA is thus only constitutionally permissible when it is the only available means to "disable the arrestee from executing" an "identified and articulable threat." *Munchel*, 991 F.3d at 1280 (quoting *Salerno*, 481 U.S. at 751) (emphasis removed).

4

In evaluating whether such an unmitigable threat exists, courts are required to consider four factors: (1) "the nature and circumstances of the offense charged"; (2) the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Considerations of the defendant's history and characteristics include "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, [and] past conduct," as well as their "criminal history, and record concerning appearance at court proceedings." *Id.* at § 3142(g)(3)(A).

Though there is a presumption that conditions cannot reasonably assure safety where, as here, a person is charged under, *inter alia*, 18 U.S.C §§ 2252(a)(2) or (4)— this presumption is "[s]ubject to rebuttal." 18 U.S.C. § 3142(e)(3)(E). The triggering of the presumption "imposes a burden of production on the defendant to offer some credible evidence" that "the case falls outside the congressional paradigm giving rise to the presumption." *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018) (citation and punctuation omitted). This burden, however, is a "modest" one, and "the relevant question" for its purposes "is not who is correct" about the evidence produced, but whether it is produced at all. *Id.* at 64. When the defendant meets this burden, the presumption is "overcome[e]" and becomes just

5

another factor for the court's consideration alongside the others in 18 U.S.C. § 3142(g). *Id.* at 63–64.

Additionally, the presumption "does not shift the burden of persuasion, which remains with the government throughout the proceeding." *Id.* at 63. "Regardless of whether the presumption applies, the government's ultimate burden is to prove that no conditions of release can assure that the defendant will appear and to assure the safety of the community." *United States v. Hunt*, 240 F.Supp. 3d 128, 132 (D.D.C. 2017).

### III. Mr. Fried has rebutted the presumption, and the statutory factors weigh in favor of release.

1. <u>Mr. Fried's History and Characteristics</u>

Mr. Fried is 56 years old. He has no criminal history of any kind. He holds a master's degree in political science from Johns Hopkins University. He has no history of drug or alcohol abuse. And until the investigation in this case arose, Mr. Fried had been consistently employed his entire adult life and owned his own home in the District of Columbia. And, as the magistrate noted in his order for detention, Mr. Fried did not flee when he became aware that he was under investigation in this case, despite having ample opportunity to do so. In fact, upon learning of the Government's investigation, Mr. Fried hired Undersigned Counsel to contact the Government and to let the Government know of his whereabouts.

Mr. Fried is also supported by his family and friends. If granted release, Mr. Fried will live with his mother, Judy Fried, in Scottsdale, Arizona where she resides in a 55+ community.[2] She has agreed to ensure that Mr. Fried follows all conditions set forth by the Court, including not having any direct or indirect contact with minors and restricted internet access.

In its memorandum seeking detention, the Government devoted much of its argument to the unsupported and inaccurate insinuation that Mr. Fried may have previously engaged in contact sexual abuse of a child. (Exhibit 2, p. 5–6). To support this claim, the Government points only to the fact that Mr. Fried has worked as an educator and to several studies finding that "children often do not disclose sexual abuse." (Exhibit 2, p.5). Mr. Fried, however, primarily taught adults and was rarely around minors.

Moreover, there is no evidence that Mr. Fried committed a contact offense, and the science in this field shows that it is highly unlikely that Mr. Fried committed a contact offense or that he would reoffend. Indeed, public estimations of both the contact offense rate and the rate of recidivism among child pornography consumers are each an "order of magnitude higher" than the rates that have actually been identified by researchers. Chad M. S. Steel, et. al., *Public*

---

[2] Specifically, Mr. Fried's mother resides at 7054 E Shooting Star Way, Scottsdale, Arizona 85266.

7

*Perceptions of Child Pornography and Child Pornography Consumers*, Archives of Sexual Behavior, January 6, 2022, at 1–13. In the *Steel* study, popular belief estimated that 72% of people who viewed child pornography would recidivate, and that 63% would engage in child abuse that involved contact with a child. *Id.* Actual measured rates of recidivism, however, were no higher than 7%. *Id.*[3] Actual rates of contact offending have been measured to be even lower: between 3 and 4%. *Id.*[4] To the extent, then, that it is appropriate to make assumptions about Mr. Fried's conduct and history on the basis of statistical generality, such evidence actually weighs in Mr. Fried's favor.

Perhaps more importantly, there is strong evidence specific to Mr. Fried demonstrating that he is not likely to reoffend. Since Mr. Fried's initial appearance in the District of Columbia, he has undergone a psychological evaluation by Dr. Sara Boyd, Ph.D. Dr. Boyd is a licensed clinical psychologist and board certified in forensic psychology. Dr. Boyd has prepared a summary of her findings which is

---

[3] These rates seem to have been stable for at least a decade. *See* U.S. Sent'g Comm'n, *2012 Report to the Congress: Federal Child Pornography Offenses*, 310 (2012) (finding the "sexual recidivism rate" among non-production child pornography offenders to be 7.4% and the "contact" sexual recidivism rate to be only 3.6%).

[4] See also Erik Faust, et. al., *Child Pornography Possessors and Child Contact Sex Offenders: A Multilevel Comparison of Demographic Characteristics and Rates of Recidivism*. Sexual Abuse: A Journal of Research and Treatment, October 27, 2015, at 460–478 (finding an overall contact recidivism rate of 3% among people found to be in possession of child pornography).

attached to this motion (*See*, Exhibit 3). In her summary, she explains that she employed the Child Pornography Offender Risk Tool (CPORT) and the Correlates of Admission of Sexual Interest in Children (CASIC) "*to assess the risk of reoffense in individuals who have charges related to illegal child sexual exploitation material.*" (Exhibit 3, p. 1).

After her assessment of Mr. Fried, Dr. Boyd arrived at the following conclusion: "*In my opinion, Mr. Fried is suitable for community release to pursue treatment under specific conditions, and the jail is not able to provide appropriate treatment to him either live or via telehealth.*" (Exhibit 3, p. 2). She also provided various recommendations for conditions of release, including: no unsupervised contact with minors, highly restricted and supervised internet usage, no activities which facilitate communications with minors, and participation with a provider who specializes in sexual behavior problems (Exhibit 3, p. 2-3).

Another factor to consider is Mr. Fried's physical condition. As a 56-year-old man with several pre-existing medical conditions, Mr. Fried is especially at risk of contracting a severe illness from COVID-19. The CDC and other public health experts have warned that the risk of severe or fatal illness from COVID-19 increases with age, with individuals in Mr. Fried's age group (50 to 64) being four times more likely to require hospitalization than the 18-29 age group and 25 times

more likely to die from complications.[5] Mr. Fried also has several pre-existing medical conditions, including obesity and high blood pressure. Public health experts have identified obesity and high blood pressure as putting individuals at an increased risk of severe illness from COVID-19.[6]

This Court has previously held that the ongoing COVID-19 pandemic can constitute such a compelling reason for temporary release when combined with "individualized reasons for why release would be necessary in [a defendant's] particular case." *United States v. Dhavale*, 2020 WL 1935544 at *6 (D.D.C. 2020). *See also United States v. Thomas*, 456 F. Supp. 3d 69 (D.D.C. 2020) (noting that "a defendant's unique vulnerability to COVID-19, when combined with other appropriate considerations, such as the original grounds for the defendant's pretrial detention, the proposed release plan, and COVID-19 risks to others, can justify a defendant's temporary release").

Near the beginning of the pandemic, the Court in *United States v. Harris* recognized that:

> COVID-19 poses a unique and serious risk to inmates and workers in detention facilities … Facilities, including jails,

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html

[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

10

> prisons, and other closed settings are associated with high transmission probabilities for infectious diseases. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. Infections that are transmitted through droplets, like COVID-19, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible.

451 F. Supp. 3d 64, 67 (D.D.C. 2020) (citations and punctuation omitted).

In the first quarter of 2021, with the development and dissemination of vaccines for the virus, some of these circumstances improved, and courts began to look more critically at requests for release due to these risks. *See*, *e.g. United States v. Worrell*, 2021 WL 2366934 at \*14 (D.D.C. 2021) (finding less risk to the defendant from the pandemic due to his vaccination status and due to low rates of reinfection); *United States v. Hicks*, 2021 WL 1634692 at \*6 (D.D.C. 2021) (noting that the defendant's argument for release was "undercut[]" by his receipt of the Pfizer vaccine, which "was 95% effective in preventing COVID-19 disease").

11

Since that time, however, circumstances have changed yet again. A new variant of the virus that causes COVID-19, dubbed "Omicron," has arisen to challenge previous notions about the pandemic. While research on the new variant is ongoing, it is already clear that existing vaccines are considerably less effective against Omicron. Far from the previous 95% efficacy rates, one study from the United Kingdom found that the efficacy of the Pfizer, Moderna, and AstraZeneca vaccines all dwindled to roughly 0% after between 20 and 24 weeks from the administration of the second dose. UK Health Security Agency, *COVID-19 vaccine surveillance report: Week 1*, January 6, 2022, at 14–16.[7] With the administration of a third "booster" dose of the vaccine, the efficacy improved, but still hovered at only 40–70% after 10 weeks. *Id.*

Knowledge of vaccine efficacy against Omicron has become crucially important in light of its prevalence. As of January 15, 2022, Omicron has become the overwhelmingly dominant strain of the virus, accounting for 99.5% of all identified infections nationwide, and 99.4% of infections in the region that includes Delaware, the District of Columbia, Maryland, Pennsylvania, Virginia, and West

---

[7]https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment _data/file/1045329/Vaccine_surveillance_report_week_1_2022.pdf.

Virginia.[8] The overall rate of infection has also gone up dramatically. In Orange County, Virginia—which is home to the facility where Mr. Fried is currently incarcerated—the case rate more than doubled its all-time high in January of 2022, and the percentage of all COVID tests that were positive as on January 16, 2022, was 34.26%.[9]

Mr. Fried's particular circumstances therefore make him particularly susceptible to becoming seriously ill if he were to contract COVID-19, and, as was discussed in *Harris* above, his incarcerated status makes it nearly impossible for him to take the needed precautions against infection. Indeed, these individualized characteristics provide a strong incentive for Mr. Fried to follow the Court's directives if released. Additionally, even if the Court is unwilling to release Mr. Fried on conditions pursuant to 18 U.S.C. § 3142(c), there would be a "compelling reason" to release him at least temporarily under § 3142(i).

---

[8] Centers for Disease Control and Prevention, *Nowcast Model*, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#variant-proportions

[9] Centers for Disease Control and Prevention, *COVID-19 Integrated County View: Orange County, Virginia*, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=Virginia&data-type=Hospital&metric-admissions= admissions_covid_confirmed_last_7_days_per_100_beds& list_select_county=51137.

2. <u>The Nature and Circumstances of the Charged Offenses and Danger to the Community.</u>

In his detention order, the magistrate found that the nature and circumstances of the offense "strongly favor[ed] detention" because Mr. Fried is alleged to have possessed more than 200 contraband images and videos, some of which dated to 2003." As the court in *Munchel* held, however, pretrial detention can only be justified if the threat posed is not only "concrete," but also "prospective." 991 F.3d at 128. Under the law, "a defendant merely posing a danger to others and the community [at a time in the past] is insufficient to warrant [the] exceptional treatment of pretrial detention," rather, such an order "must be predicated on a finding that a defendant in fact poses a threat of committing [harm] in the future." *United States v. Owens*, 2021 WL 2188144 at *6 (D.D.C. 2021) (citations and punctuation omitted).

Here, the Government has proffered no information to suggest that Mr. Fried would be a danger if released beyond generalized concerns. In contrast, Mr. Fried has shown through scientific studies and an independent psychology examination that he is highly unlikely to be a danger if released with proper conditions. Notably, 18 U.S.C. § 3142(e)(1) only requires reasonable assurance that a combination of conditions will protect the community, not a guarantee. As such, the evidence presented above shows that the Court is able to fashion a combination of conditions to adequately ensure the safety of the community.

14

### 3. The Purported Weight of the Evidence

The weight of the evidence against the defendant is the "least important" of the BRA's statutory factors. *United States v. Klein*, 533 F. Supp. 3d 1, 15 (D.D.C. 2021). It would be a violation of due process to "authorize pretrial detention based simply on a preliminary assessment of the defendant's guilt." *Taylor*, 289 F. Supp. 3d at 66. "[T]he Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure [community safety]," and "[e]ven overwhelming evidence of guilt would not, alone, meet that test." *Id*. As such, even if the Government's evidence against Mr. Fried could be characterized as strong, this factor should only weigh minimally against Mr. Fried. Overall, the balance tips strongly in favor of releasing Mr. Fried with various conditions of release.

### IV. Conditions of Release

While Mr. Fried will abide by any and all conditions imposed by the Court, Counsel notes that the Court can employ the following conditions to ensure that Mr. Fried does not pose a danger and that he returns to court:

- Electronic monitoring
- Home detention
- Required to reside at his mother's residence in Scottsdale, Arizona

- No use of smart phones, computers, iPads, tablets, or any device which would allow for access to the internet

- No direct or indirect contact with minors

- Participation in a treatment program with a provider that specializes in sexual behavior problems.

## CONCLUSION

For these reasons, Counsel for Mr. Fried respectfully requests that the Court revoke or amend the Order of Detention Pending Trial, or in the alternative, that the Court grant a temporary release until the COVID-19 pandemic has subsided.

This 24th day of January, 2022.

PATE, JOHNSON & CHURCH, LLC

/s/ Jess B. Johnson
Jess B. Johnson
Bar ID: 1034072
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310
(404) 223-3392 (Fax)

/s/ Cary Citronberg
Cary Citronberg, VSB 81363
114 N. Alfred St.
Alexandria, Virginia 22314
Tel. (703) 684-8000
Fax. (703) 684-9700

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of January 2022, I electronically filed the foregoing Motion with the Clerk of Court using the CM/ECF system, which will automatically send notifications of such filing to all counsel of record in this matter.

This 24th day of January, 2022.

/s/ Jess B. Johnson
Jess B. Johnson
Bar ID: 1034072
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310
(404) 223-3392 (Fax)
